Vaidik, Chief Judge, dissenting.
[32] Disability of a parent alone is not sufficient to justify a change in physical custody; the disability must adversely affect the child such that modification of custody is in the child's best interests. Here, the trial court changed physical custody of Child based solely on Mother's ability to communicate without any evidence that it negatively impacted Child. Accordingly, I dissent.
[33] Mother suffered a stroke in 2013 and, as a result, had difficulty communicating verbally. Mother's intelligence, however, was not affected by the stroke. She faithfully attended speech therapy, both individual and group sessions, and progressed from being able to utter a single word to speaking in full sentences. Mother accomplished every therapy goal, and each goal has been for Child's benefit. Almost three years after Mother's stroke, Father-for the first time-petitioned for a custody modification. The trial court granted Father's petition, citing in its order Mother's communication issues as the reason for transferring primary custody to Father. Mother's communication issues can be separated into two categories: 1) Mother and Father's miscommunications with one another and 2) Mother's communication with Child.
[34] Regarding the parents' communication problems, they are caused by hurdles faced by many separated parents and revolve mainly around the parenting-time schedule. Mother and Father argued over which version of the Indiana Parenting Time Guidelines governed their parenting-time schedule. Father believed that he and Mother had informally agreed to use the 2013 Guidelines (which would give him additional parenting time), but Mother believed that the 2008 Guidelines governed because of the paternity order (the only order issued by the court before their dispute). Because of this ongoing feud, Mother asked the trial court to clarify which Guidelines governed. Despite these arguments, Father continued to exercise regular parenting time with Child. Nothing in the record suggests that the communication issues between the parents have adversely affected Child.
[35] As for Mother's communication issues with Child, Father argued that Child has and will continue to suffer in school because of Mother's inability to help Child with her school work. Father claims that he and his live-in fiancée are better able to help Child with her homework. In first grade, Child received grades indicating that she "need[ed] improvement" in some *1143 subjects. Resp't's Ex. A. Mother promptly hired a tutor, and Child's grades improved. It is true that Mother did not keep Child in tutoring for second grade, but Mother was never asked about this decision. All we know is that after one grading period, Child was struggling in only one area: writing. When Child was in first grade, Mother hired a tutor after two grading periods were completed. There is nothing to indicate that Mother will not do the same thing should Child's writing grade not improve or her other grades begin to fall. Mother has shown that she can, and will, take the necessary actions to ensure Child's academic success.
[36] Father also expressed concern that Child had been "put in the situation where she's got to try and communicate stuff with me" for Mother. Tr. Vol. II, p. 76. But only one instance was discussed where this actually occurred: a dispute over which parent had Child for fall break. Father stated that during the argument Mother would look to Child to help her find the right words. But Essig, Mother's speech therapist, explained that it is normal for anyone to fill in the pause in communication to move the conversation along. Essig speculated that when Child is with Mother, Child most likely picks up on the "pause being slightly awkward and want[s] to help move [Mother] on to the next word[.]" Id. at 215. And even if Father is correct and Mother relied on Child to help her during this argument, it was an isolated occurrence and does not rise to the level of negatively impacting Child such that modification of custody is in her best interests.
[37] All the other reasons relied upon by the majority to affirm the trial court (but not cited by the trial court itself) do not justify a modification of custody. One-time occurrences of gum in Child's hair and soiled clothes do not support a custody change. Nor do a rash that Mother has had seen by a dermatologist, chapped ears that were the result of Child's earrings, or clothes stained after spending the day at school. These are simply byproducts of living the life of a seven-year-old.
[38] No one testified that Mother was not a good mother. In fact, two witnesses testified that they had no concerns about Mother's parenting. See id. at 173, 193. Many parents suffer from disabilities but are good parents. Mother is one. She owns her own home in Plymouth, where she and Child have lived since Child was born. Mother pays her bills, provides food and clothing for Child, and maintains a clean home without any help from others. She has provided a lifetime of stability for Child. Child attends a good school, and every morning Mother puts Child on the school bus and greets Child at the bus at the end of the school day. Child had almost perfect attendance in first and second grade. Additionally, Mother has enrolled Child in extracurricular activities.
[39] Furthermore, no custody evaluation was done; no teacher testified; no Guardian Ad Litem report was ordered. What is in Child's best interests was solely determined from the testimony at the custody hearing. Child has grown up living near her grandmother and aunt, and she sees them often. At Father's home, Child will attend a school that we know nothing about other than Father's claim that it is a "great school district." Id. at 74. After school and during extended breaks from school, Child will be at home with a babysitter, as Father and his fiancée both work. Both Father and his fiancée stated that the babysitter would be fiancée's mother, but she did not testify. As the majority notes, the record is completely silent on what kind of relationship Child has with the fiancée's mother.
[40] I understand that this Court is to be deferential to the trial court in child-custody matters and that we grant this deference *1144 because the trial court sees and hears the witnesses. Here, undoubtedly, the trial court had the advantage of seeing and hearing Mother testify. But the evidence must show that the change in circumstances adversely affected Child such that modification is in Child's bests interests. There was no such evidence here. Just as it is improper to modify custody based on arbitrary changes (e.g. parent's income level), it is improper for the trial court to modify custody based solely on a parent's disability without any showing as to how that disability negatively impacts the Child. Today's decision creates unnecessary anxiety for good parents who also happen to have a disability. I firmly believe that, in this case, it was a mistake to modify primary custody from Mother to Father.